| Wm. A. Needham et al. vs. Jack Rose | Eq.No.7070 |

January 19, 1926

BAKER, J. Final Hearing.

This is a bill brought by the administrator and certain heirs at law of one Julia Rose to set aside a certain deed of property in East Providence made by the said Julia Rose to the respondent.

The facts in the case show that said Julia Rose, who was the mother of the respondent and most of the complainants, on May 31, 1923, made certain agreement in writing with the respondent and executed the deed in question to him. The agreement contained the following provision: "and Jack Rose, in consideration of the conveyance to him of the premises in question hereby agrees with said Julia Rose that he will, so long as she shall live provide her with a home, give her such support and

maintenance, care, and attention as his circumstances will permit, and upon her death will pay the cost of necessary and reasonable funeral expenses."

The agreement contained the further provision that if the respondent should fail to perform his part of the agreement, the deed in question should be void and the premises therein described should revert to the said Julia Rose, her heirs and assigns.

In support of their bill the complainants contend that the said respondent did not properly care for his mother during her lifetime, that he has not paid the cost of the funeral expenses, and, in particular, that at the time of the agreement and deed in question were made, the said Julia Rose did not have mental capacity to execute the same.

The evidence shows that the property in question is a small cottage with a parcel of land in East Providence, of a tax value of about $775. It formerly belonged to another son of the said Julia Rose, who died intestate a short time before his mother executed the papers in question, the property coming to her from said deceased son, who, prior to his death, had lived with and taken care of his mother. It further appears that the said Julia Rose, who died July 18, 1924, some fourteen months after the execution of the instruments in question, had a shock about October 1922 and a second shock sometime in March 1923. The evidence also shows that after the death of the son from whom Mrs. Rose inherited the property, the respondent gave up his work and looked after his mother. Most of the complainants, other sons and daughters of Mrs. Rose, had homes and families of their own.

In regard to the matter of the care and attention which the respondent gave his mother, the Court after weighing the testimony believes that it shows that he performed this part of the agreement. It appears from the evidence that he gave his mother, who was a very large, heavy woman, and, owing to her physical condition, was not able to move much, such care, attention and support as his circumstances would permit. When he found that there were certain things that he was not able to do for her, he employed a woman by the day to assist about the house and to perform such duties for his mother as he himself could not do. It is clear from the testimony that the complainants visited Mrs. Rose from time to time as they were able to, and unquestionably brought her food and did what they could to make her comfortable. The Court has some question in its mind as to the amount of money which some of them brought. It is possible that occasionally small sums of money were given Mrs. Rose by certain of the complainants, but on the evidence the Court does not think that this was in any way a uniform practice. About the only complaint made in regard to the care the respondent gave his mother is that he did not always come to her as soon as she called when she desired to be moved. This, in the judgment of the Court, does not seem to be a very vital objection. A consideration of the whole testimony bearing on this question clearly satisfies the mind of the Court that the respondent was doing what he could to look after his mother, and the Court finds that he has carried out that portion of his agreement.

The testimony shows that at the time of his mother's death, the state of her finances and those of the respondent was rather low. Apparently they had been living partly on money which the mother had inher-

ited from the deceased son, although the respondent had also been spending certain money which he had saved. It also appears that Miss Montero, who was boarding at the house, paid in a certain amount more or less regularly. Shortly before his mother died, however, it appears that the respondent had to work half days in order to earn money. In the opinion of the Court this question has some bearing on the matter of the payment of the funeral expenses. The evidence shows that to date the respondent had paid about $75 on account of an undertaker's bill of something over $350. The respondent testifies that he is willing and expects to pay the rest of this bill as soon as he can raise the necessary funds, and that this litigation is to a certain extent hampering him. The undertaker testified and apparently was not pressing the respondent on the claim. In connection with this matter the Court finds that the respondent is doing what he reasonably can to perform this part of his agreement and that the deed in question shouuld not be set aside on the ground that he has not taken care of the reasonable funeral expenses.

The chief ground which the complainants allege in support of their bill is that Julia Rose did not have mental capacity to execute the deed in question.

The evidence as to her age at the time the deed was made was rather uncertain. The complainants claim that she was upwards of eighty years old. The attorney who drew and saw to the execution of the papers testified that she appeared to him to be a woman in the neighborhood of seventy-four or seventy-five years of age. She was born in the Cape Verde Island and there is, of course, no authentic record of her birth and of her exact age. It is clear that she was a woman well along in years but there is no definite testimony from which the Court can tell exactly how old she was.

The general line of testimony introduced by the complainants tended to show that immediately after the first shock, in October 1922, she was in a coma for some short time but that this condition gradually cleared up and that, while she was not able to move much, she was fairly well for some time. They contend, however, that after the second shock her condition became worse, that she had some difficulty in talking and making herself understood, that her mind was not clear, that she was not able to feed herself or to move to any great extent, that she apparently did not realize much about her son's death, and that she gradually grew worse until she died in July 1924.

The respondent urges on the other hand, that Mrs. Rose's condition was not by any means as serious as the complainants claim. He produced evidence which tended to show that after the first shock his mother had a good recovery; that her mind was not affected and that she had no difficulty in conversing with people or making her wishes understood; that the only effect of this shock was to hinder her from moving about and that she had to receive care and attention. He also contends that while there was a second shock, it was not particularly serious and that his mother retained full use of her mental faculties, although she had greater difficulty in moving and looking out for herself, and that she had to be given greater care, and that it was not until a few weeks before her death in early 1924 that her speech and understanding became impaired.

The witnesses on behalf of the complainants are practically all interested parties. On the other hand,

the witnesses produced on behalf of the respondent are the attorney who drew the papers, a Mr. Davis, an interpreter, three disinterested neighbors and friends, the woman who worked at the house for some time, and the respondent. The latter impressed the Court as apparently honest. His mind was slow and he clearly was a man of no education and of not a very high degree of intelligence. He did not strike the Court as the type of person who would carry through some fraudulent or improper transaction. No fraud or undue influence is alleged or claimed by the complainant. The testimony of the attorney who prepared the papers shows clearly that the first suggestion for the disposition of her property came from Mrs. Rose herself. She desired a will drawn leaving everything to the respondent. The agreement and deed came about through the suggestion of the attorney as a better way of handling the situation. After their execution these papers were immediately recorded, there apparently being no desire to conceal what had been done, although it does appear that the complainants were not personally informed of what had taken place. The testimony of the attorney and interpreter, both men of standing, shows beyond dispute that in their judgment and opinion Mrs. Rose had full possession of her mental faculties at the time the papers in question were executed, and knew and understood fully what she was doing, and that the documents were carrying out her desire in regard to the property. In view of the fact that her other children were married and had homes of their own, the conveying of the property to the respondent in consideration of future care and support does not seem unreasonable. The length of time Mrs. Rose would live was un-

certain, as a matter of fact she did live between thirteen and fourteen months after the papers were executed.

The complainants, in connection with the signing of the documents, raise a further objection in regard to the interpreter. It is contended that Mrs. Rose is a native of Cape Verde Island and that the interpreter used came from the Azores, and that the dialect in the two places is entirely different. The evidence shows clearly, however, that the papers in question were read and explained to Mrs. Rose and that apparently she understood their contents. In any event she made no objection to the interpreter produced; she made no claim that she could not understand him, and apparently raised no objection to the way the matter was being transacted. In the opinion of the Court, if the serious differences in dialect had existed which the complainants contend for, it would seem that Mrs. Rose would have raised some question of objection. While the Court does not doubt the fact that such differences do exist, the Court does not believe they are so insurmountable as the complainants would contend for.

The general line of evidence produced by the respondent through disinterested neighbors would tend to show that Mrs. Rose, while more or less helpless physically, was mentally reasonably active and alert up to within a few weeks of her death. There is no question but that at times she lost her powers of speech and undoubtedly her mental faculties also.

A careful weighing of all the testimony produced in the case leads the Court to the opinion that at the time the papers in question were executed Mrs. Rose was mentally competent to make and execute them. The Court finds that the fair preponderance of the evidence is with the disinterested

witnesses produced by the respondent rather than with the more or less interested witnesses produced by the complainants.

In view of these findings the Court will answer the first two issues of fact presented for determination, "yes."

The third issue in consideration of the above, does not strictly speaking require an answer. The Court will say, however, that the testimony shows that the respondent by staying away from his work and caring for his mother did lose considerable money and also expended more or less time and money of his own in carrying out the terms of his agreement.

The prayer of the bill is denied and the bill is dismissed.

For Complainants: Baker & Spicer.

For Respondent: C. Leslie Cordery.